## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

TERRY MUNTZERT,                          )
                                         )
                    Plaintiff,           )
                                         )   CIVIL ACTION
v.                                       )
                                         )   No. 06-2329-CM-JTR
                                         )
MICHAEL J. ASTRUE,[1]                    )
Commissioner of Social Security,         )
                                         )
                    Defendant.           )
_____ )

### REPORT AND RECOMMENDATION

Plaintiff seeks review of a final decision of the Commissioner of Social Security (hereinafter Commissioner) denying disability insurance benefits (DIB) and supplemental security income (SSI) under sections 216(i), 223, 1602 and 1614(a)(3)(A) of the Social Security Act. 42 U.S.C. §§ 416(i), 423, 1381a, and 1382c(a)(3)(A)(hereinafter the Act). The matter has been referred to this court for a report and recommendation. The court recommends the Commissioner's decision be REVERSED and JUDGMENT be entered pursuant to the fourth sentence of 42 U.S.C.

_____

[1]On Feb. 12, 2007, Michael J. Astrue was sworn in as Commissioner of Social Security. In accordance with Rule 25(d)(1) of the Federal Rules of Civil Procedure, Mr. Astrue is substituted for Commissioner Jo Anne B. Barnhart as the defendant. In accordance with the last sentence of 42 U.S.C. § 405(g), no further action is necessary.

§ 405(g) REMANDING the case for further proceedings in accordance with this opinion.

## I.   Background

This case has an extended history.  Plaintiff's applications were denied initially, upon reconsideration, and after a hearing before an Administrative Law Judge (ALJ).  (R. 20, 48-49, 487, 488-513).  The Appeals Council granted plaintiff's request for review, vacated the ALJ's decision because there was "no vocational evidence in the record regarding the extent to which the claimant's additional nonexertional limitations erode the occupational base for light work" (R. 515), and remanded the case to an ALJ to obtain evidence from a vocational expert, offer plaintiff the opportunity for a hearing, and take any further action necessary to reach a decision.  (R. 516).  While plaintiff's request for review was pending, he filed another application for SSI which was consolidated with the case on remand.  (R. 20, 809-17).

On remand, a hearing was held at which plaintiff was represented by counsel.  (R. 20, 858-909).  Plaintiff, his father, and a vocational expert testified at the hearing.  (R. 20, 859).  The record was held open for thirty days to allow school records to be submitted in support of plaintiff's allegation that his condition meets Listing 12.05(C).  (R. 860-

61).  The school records were received (R. 656-62), and the ALJ
issued his decision.  (R. 20-32).

     The ALJ determined that plaintiff has severe impairments
consisting of degenerative joint disease of the right ankle,
obesity, sleep apnea, depression, borderline intellectual
functioning, and insulin dependent diabetes, but that his
condition does not meet or equal the severity of any criterion in
the Listing of Impairments.  (R. 31, finding no. 3).
Specifically, the ALJ considered the report of a consultative
mental status examination prepared by Dr. Robert Barnett, Ph.D.,
including a Verbal IQ of 66, Performance IQ of 64, and Full Scale
IQ of 62, and found that the IQ scores are not valid.  (R. 26-
27).  He concluded, therefore, that plaintiff's condition does
not meet or equal the criteria of Listing 12.05(C).  (R. 27).

     He assessed plaintiff with the residual functional capacity
(RFC) for a range of light work with a significant number of
postural, environmental, and mental limitations.  (R. 31-32,
finding no. 5).  He found that plaintiff is capable of performing
his past relevant work as a production assembly worker as that
work is generally performed, or that, using Medical-Vocational
Rule 202.21 as a framework, plaintiff is capable of performing a
range of unskilled, light work.  Id., findings no. 6, 7.
Consequently, he found plaintiff is not disabled within the
meaning of the Act, and denied his applications.  Id.

Plaintiff sought and was denied Appeals Council review of the ALJ decision.  (R. 12-14, 820).  Therefore, the ALJ decision is the final decision of the Commissioner.  (R. 12); Threet v. Barnhart, 353 F.3d 1185, 1187 (10th Cir. 2003).  Plaintiff now seeks judicial review.

## II.  Legal Standard

The court's review is guided by the Act.  42 U.S.C. §§ 405(g), 1383(c)(3).  Section 405(g) provides, "The findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive."  The court must determine whether the factual findings are supported by substantial evidence in the record and whether the ALJ applied the correct legal standard. White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001). Substantial evidence is more than a scintilla, but less than a preponderance, it is such evidence as a reasonable mind might accept to support the conclusion.  Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988).  The court may "neither reweigh the evidence nor substitute [it's] judgment for that of the agency." White, 287 F.3d at 905 (quoting Casias v. Sec'y of Health & Human Serv., 933 F.2d 799, 800 (10th Cir. 1991)).  The determination of whether substantial evidence supports the Commissioner's decision, however, is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other

-4-

evidence or if it constitutes mere conclusion.  <u>Gossett</u>, 862 F.2d at 804-05; <u>Ray v. Bowen</u>, 865 F.2d 222, 224 (10th Cir. 1989).

An individual is under a disability only if that individual can establish that he has a physical or mental impairment which prevents him from engaging in substantial gainful activity and is expected to result in death or to last for a continuous period of at least twelve months.  42 U.S.C. § 423(d); <u>see also</u>, <u>Barnhart v. Walton</u>, 535 U.S. 212, 217-22 (2002)(both impairment and inability to work must last twelve months).  The claimant's impairments must be of such severity that he is not only unable to perform his past relevant work, but cannot, considering his age, education, and work experience, engage in any other substantial gainful work existing in the national economy.  <u>Id.</u>; 20 C.F.R. §§ 404.1520, 416.920 (2005).

The Commissioner has established a five-step sequential process to evaluate whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920; <u>Allen v. Barnhart</u>, 357 F.3d 1140, 1142 (10th Cir. 2004); <u>Ray</u>, 865 F.2d at 224.  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." <u>Williams v. Bowen</u>, 844 F.2d 748, 750 (10th Cir. 1988).

In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity since the alleged onset of disability, whether he has severe

impairments, and whether the severity of his impairments meets or equals the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1).  Id. at 750-51.  If claimant's impairments do not meet or equal the severity of a listed impairment, the Commissioner assesses claimant's RFC.  20 C.F.R. §§ 404.1520, 416.920.  This assessment is used at both step four and step five of the process.  Id.

After assessing claimant's RFC, the Commissioner evaluates steps four and five, whether the claimant can perform his past relevant work, and whether he is able to perform other work in the economy.  Williams, 844 F.2d at 751.  In steps one through four the burden is on claimant to prove a disability that prevents performance of past relevant work.  Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2.  At step five, the burden shifts to the Commissioner to show other jobs in the economy within plaintiff's capacity.  Id.; Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999).

Plaintiff makes only one claim of error.  He claims his condition meets Listing 12.05(C), and the ALJ's contrary finding is not supported by substantial evidence in the record.  (Pl. Br., 23-29).  The Commissioner argues that the ALJ's finding is supported by substantial evidence, and that plaintiff cannot show either that he has significantly subaverage intellectual functioning with deficits in adaptive functioning initially

manifested before age twenty-two, or that he has a valid IQ of 60 through 70.  (Comm'r Br., 5-8).  The court finds the ALJ's determination regarding Listing 12.05(C) is not supported by substantial evidence in the record as a whole.

**III. Listing 12.05(C)**

> **A.**   **<u>Legal Standard Applicable at Step Three</u>**

If plaintiff's condition meets or equals the severity of a listed impairment, that impairment is conclusively presumed disabling.  <u>Williams</u>, 844 F.2d at 751; <u>see</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 141 (1987) (if claimant's impairment "meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled").  However, plaintiff "has the burden at step three of demonstrating, through medical evidence, that his impairments 'meet <u>all</u> of the specified medical criteria' contained in a particular listing." <u>Riddle v. Halter</u>, No. 00-7043, 2001 WL 282344 at *1 (10th Cir. Mar. 22, 2001) (quoting <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990) (emphasis in <u>Zebley</u>)).

Listing 12.05 provides, in relevant part:

> <u>Mental retardation:</u>  Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period: i.e., the evidence demonstrates or supports onset of the impairment before age 22.

> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

-7-

. . .

    C.    A valid verbal, performance, or full scale IQ of
        60 through 70 and a physical or other mental
        impairment imposing an additional and significant
        work-related limitation of function;

20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.05.

Listing 12.05 is somewhat different than the other listings
for mental disorders.  Id., § 12.00(A).  The listing contains a
diagnostic description of mental retardation (introductory
paragraph) and four sets of criteria describing listing-level
severity (Paragraphs A through D).  20 C.F.R., Pt. 404, Subpt. P,
App. 1 §§ 12.00(A), 12.05(A-D).  There are four distinct ways in
which a claimant may establish disability pursuant to listing
12.05.  Id.; McKown v. Shalala, No. 93-7000, 1993 WL 335788, *1
(10th Cir. Aug. 26, 1993).  To meet the listing, plaintiff must
show that his condition satisfies both the diagnostic description
of mental retardation and one of the four severity criteria.
Id., § 12.00(A).

The IQ scores in Listing 12.05 are based upon results of
intelligence tests that have a mean of 100 and a standard
deviation of 15.  20 C.F.R., Pt. 404, Subpt. P, App. 1
§ 12.00(D)(6)(c).  Where an intelligence test provides verbal,
performance, and full scale IQ scores, the lowest score of the
three will be used when considering Listing 12.05(C).  Id.  If
the claimant has an additional physical or mental impairment(s)

-8-

which is "severe" at step two within the meaning of 20 C.F.R.
§§ 404.1520(c), 416.920(c), it will be considered to impose an
additional and significant work-related limitation of function in
accordance with Listing 12.05(C).  20 C.F.R., Pt. 404, Subpt. P,
App. 1 § 12.00(A); see also, Hinkle v. Apfel, 132 F.3d 1349,
1352-53 (10th Cir. 1997) (reaching the same conclusion before the
regulations were changed in 2000 to specify the equivalence
between "severe" impairments and "additional and significant
work-related limitation of function.").

     With regard to demonstrating onset of mental retardation
before age twenty-two, the Fourth, Eighth, and Eleventh Circuits
have held that IQ is relatively constant throughout life and an
IQ score after age twenty-two is evidence of an individual's IQ
being the same before age twenty-two.  Luckey v. Dep't of Health
& Human Serv., 890 F.2d 666 (4th Cir. 1989)("in the absence of
any evidence of a change in a claimant's intelligence
functioning, it must be assumed that the claimant's IQ had
remained relatively constant"); Sird v. Chater, 105 F.3d 401 (8th
Cir. 1997)(citing Luckey); and Hodges v. Barnhart, 276 F.3d 1265,
1268-69 (11th Cir. 2001)(adopting a presumption that IQ remains
constant absent evidence of a change in intellectual
functioning).

     The Tenth Circuit has not addressed the issue whether mental
retardation may be presumed to have manifested during the

-9-

developmental period.  However, it noted that circuit courts have
liberally construed the early manifestation requirement whereby a
claimant "is not required to affirmatively prove that he was
mentally retarded prior to reaching the age of twenty two so long
as there was no evidence that claimant's IQ had changed."  McKown
v. Shalala, No. 93-7000, 1993 WL 335788, at *3 (10th Cir. Aug.
26, 1993).  Therefore, to meet Listing 12.05(C), a claimant must
show:  (1) evidence of onset of mental retardation before age
twenty-two, (2) a valid IQ score of 60 through 70, and
(3) another severe impairment.[2]

### B.    The ALJ's Decision with Regard to Listing 12.05(C)

The ALJ discussed the Feb. 25, 2003 consultative mental
status examination performed by Dr. Robert W. Barnett, Ph.D.:

> The claimant related a history of insulin-dependent
> diabetes mellitus, glaucoma with blurry vision,
> obesity, feeling "kind of depressed", memory problems,
> crying spells, and having a bad temper.  The claimant
> told the examiner he got along well with coworkers and
> supervisors in the past, but he now was cautious with
> difficulty trusting others, and he related some
> suicidal ideation.  He also stated he no longer had a
> drinking problem.  It was noted the claimant graduated
> from high school where he attended regular classes and
> his grades were C's and D's.  He also attended truck
> driving school and had a commercial driver's license.
>
> Dr. Barnett further noted the claimant intellectually
> gave the impression of functioning in the borderline to

---

[2]Plaintiff asserts Listing 12.05(C) requires a "two-pronged"
analysis consisting of criteria (2) and (3) above.  (Pl. Br.,
23).  However, plaintiff's two-pronged analysis does not account
for the diagnostic description of mental retardation requiring
evidence of onset before age twenty-two.

mildly mentally retarded range with a mildly dysphoric
affect.  During the interview his thought processes
appeared intact and he was alert and fully oriented
with an intact memory for remote events.  On the WAIS-
III test the claimant achieved a Verbal IQ of 66, a
Performance IQ of 64, and a Full Scale IQ of 62.  Dr.
Barnett observed that the claimant appeared mildly
instinctually [sic][3] limited but he gave the impression
more of functioning in the borderline range than the
mildly mentally retarded range.  His memory scores were
consistent with an IQ in the low average to borderline
range and he showed no difficulty with attention or
concentration during the interview.  The examiner
opined that the lower IQ scores may be a result of
visual problems.

(R. 23)(citing (Exhibit 12F pp. 119-122)(R. 340-43)).

The ALJ recognized plaintiff's therapist had opined that
plaintiff's mental abilities and aptitude needed to do <u>unskilled</u>
work were "poor to none" in five areas, and plaintiff's mental
abilities and aptitude needed to do <u>semiskilled</u> and <u>skilled</u> work
were "poor to none" in the area of dealing with the stress of
that work.  (R. 25).  The ALJ gave "little weight" to the
therapist's opinion, finding the opinion inconsistent with the
therapist's progress notes and with other notes from the
Southeast Kansas Mental Health Center, finding the therapist not
qualified to assess the plaintiff's mental abilities in so far as
her assessment is based upon medical symptoms, and finding the

---

[3]The court finds this is a typographical error in the
decision.  Dr. Barnett's report reflects that plaintiff "does
appear mildly <u>intellectually</u> limited but he gives the impression
more of functioning in the borderline range than the mildly
mentally retarded range."  (R. 342-43)(emphasis added).

therapist's opinion is "based upon the claimant's subjective complaints." (R. 25-26).

The ALJ applied the Psychiatric Review Technique (PRT), and determine that plaintiff has "mild" limitations in activities of daily living, "mild to moderate" limitations in maintaining social functioning and in maintaining concentration, persistence or pace, "no" episodes of deterioration of extended duration, and no "C" criteria are present in the evidence. (R. 26). He noted plaintiff's activities of daily living demonstrate successful independent living and that plaintiff continued performing part-time work involving significant mental activities after the alleged onset of disability. (R. 28). The ALJ recognized plaintiff's claim that his condition meets Listing 12.05(C), but found that the IQ scores received on the intelligence testing performed by Dr. Barnett are not valid and, therefore, plaintiff's condition does not meet or equal Listing 12.05(C). (R. 26-27).[4]

The ALJ gave several reasons for finding the IQ scores not valid: (1) Dr. Barnett's exam. During the interview, plaintiff was alert and oriented, showed no difficulty with attention or concentration, and had an intact memory for remote events. Plaintiff gave the impression of functioning in the borderline

---

[4]The ALJ stated that Listing 12.05(C) is met with a valid IQ score of 60 through 70, and another "severe" impairment, but did not address onset before age twenty-two. (R. 26).

rather than the mildly mentally retarded range. Plaintiff's
memory scores were consistent with borderline to low average IQ.
Dr. Barnett opined that the low IQ scores might be the result of
visual problems while taking the test. (2) Plaintiff's high
school record. Plaintiff did not attend special education
classes, graduated from high school with grades of B's, C's and
D's and a grade point average of 1.94, and ranked 85 in a class
of 101. (3) Plaintiff's work history. Plaintiff attended truck
driving school, has a commercial driver's license, and was
employed driving a truck.

The ALJ assessed plaintiff's mental RFC:

> The claimant retains sufficient mental residual
> functional capacity for competitive level employment.
> Due to the combination of depression and impaired
> cognition, he would do best with work that is routine,
> repetitive, and predictable and in situations where he
> could work generally on his own and at his own pace
> rather than one that requires extensive interaction
> with others.

(R. 29).

### C. Record Evidence Relevant to Listing 12.05(C)

As the ALJ noted, plaintiff had a mental status examination
with Dr. Barnett during which he was given a WAIS-III IQ test and
a Wechsler Memory Scale Test, with IQ scores as reported above.
Dr. Barnett noted that plaintiff had below average personal
hygiene with a noticeable odor. (R. 340). Plaintiff was
cooperative, friendly, and made a good effort, "but the validity
of the testing may have been negatively affected due to his

vision problems.  He made continual complaints throughout the
testing of having difficulty seeing the items. . . . He complains
of glaucoma and said his vision is limited and "very blurry."
Id.  Plaintiff reported a psychiatric hospitalization in the
Osowatomie State Hospital in 1985 due to "marital problems."  (R.
341).  The psychologist reported plaintiff "presented as a
friendly individual who made a number of spontaneous
verbalizations which were mildly circumstantial and tangential.
His eye contact was variable and he has active sense of humor."
Id.

>He is facially normal and displayed below average
>grooming.  Intellectually, he gives the impression of
>functioning in the borderline to mildly mentally
>retarded range which was confirmed by his scores on the
>WAIS-III. . . . His thought processes during the
>interview appeared intact. . . . He admits to
>difficulty trusting others, but describes himself as
>careful and cautious rather than paranoid.  Mr.
>Muntzert alleges memory problems and says he is prone
>to losing things.
>
>. . .
>
>He was alert and fully oriented for the interview.  He
>correctly named the current and last two presidents.
>He performed serial 7's accurately but very slowly.  He
>could recall one out of three items in three minutes.
>On the WAIS-III, he was able to recite four digits
>forward and three digits backwards.  His memory for
>remote events when formally assessed was intact.

(R. 341).

Dr. Barnett diagnosed plaintiff with borderline intellectual
functioning, consider mild mental retardation.  (R. 342).  Dr.
Barnett summarized his opinions in a "Clinical Assessment

-14-

Regarding Ability to Work:"  He noted plaintiff said when he
worked in the past he got along well with coworkers and
supervisors.  He stated, "Mr. Muntzert does appear mildly
intellectually limited but he gives the impression more of
functioning in the borderline range than the mildly mentally
retarded range.  His lower scores may be the result of visual
problems and I note that several of his memory scores were more
consistent with an IQ in the low average to borderline range than
those associated with mild mental retardation.  He showed no
difficulty with attention or concentration during the interview."
(R. 342-43).

     Dr. Stanley Mintz, Ph.D., performed two consultative mental
status examinations of plaintiff, one on July 20, 2002, and
another on Dec. 18, 2004.  (R. 297-99, 733-35).  At the first
examination, in summarizing plaintiff's background Dr. Mintz
stated that plaintiff "notes that 'My first wife sent me to
Osowatomie State Hospital – I was working too much.  She said I
was fooling around behind her back'.  He states he was a patient
at Osowatomie State Hospital for two years at that time."  (R.
297).  Dr. Mintz reported plaintiff is a pleasant gentleman with
only fair dress and grooming who was alert and oriented.  (R.
298).  Dr. Mintz commented, "Overall, in my opinion, he is a
limited informant.  He may suffer cognitive loss."  Id.  The
psychologist stated, "He functions perhaps in the borderline

-15-

intellectual range, but he may function as low as within the mild
mentally retarded range.  He cannot name the current president.
He is not sure of the immediate past president.  He is not able
to recite the alphabet.  After a couple of tries, he goes 'a b c
d f j h i k.'  He also does this slowly.  He makes one error in
counting backwards from twenty to one.  He is not able to count
from one to forty by serial threes.  He exhibits significant
deficiency in terms of immediate attention span and concentration
capability.  He appears sleepy.  He appears groggy.  Verbal
extraction ability appears only fair. . . . Formal judgment and
reasoning appears impaired."  (R. 298).  Dr. Mintz diagnosed
plaintiff as "Rule Out Cognitive Disorder NOS, Consider
Functioning Within Borderline Intellectual Range, Consider
Functioning Within Mild Mentally Retarded Range."  (R. 299).  He
summarized his opinion:  "Mr. Muntzert does not appear
particularly alert.  He notes problems sleeping and problems in
terms of cognitive loss and memory loss.  He does not appear
fully capable of interacting well with coworkers and supervisors
at this time.  He appears able to understand simple instructions.
Concentration capacity appears diminished.  He does not appear
fully capable of handling his funds."  Id.

    At the second examination, Dr. Mintz mentioned fewer
indications of intellectual deficiencies.  He noted the
presenting problems were depression, anger, history of drinking,

suicidal ideation, crying spells, feeling sad, lonely,

hopelessness, and helplessness.  (R. 733).  He noted plaintiff's

appearance as fair, generally adequate, and he was alert and

oriented with no evidence of psychoses.  (R. 734).  His summary

of the mental status examination appears in part as follows:

> Mr. Muntzert appears to function within the borderline
> intellectual range with similar levels of memory
> functioning.  He notes the correct date, he can name
> the president and past president correctly.  He is able
> to recite the alphabet, he can count backwards from 20
> to 1, he can count from 1 to 40 by serial threes,
> although slowly and haltingly.  He is able to identify
> two out of three words given five minutes previously.
> . . . Concentration capacity appears fair. . . . His
> verbal abstraction abilities appear adequate.

(R. 734).

> Dr. Mintz summarized plaintiff's condition:

> Mr. Terry Muntzert appears as a depressed, alienated,
> angry gentleman who has exhibited inappropriate
> ideation and behaviors previously.  He appears able to
> understand simple and intermediate instructions, he is
> easily stressed, he may have some difficulty at this
> time interacting well with others.  He does not appear
> fully capable of handling his own funds due to a
> history of drinking.

(R. 735).

As the ALJ acknowledged, plaintiff's therapist completed a

"Medical Opinion Re:  Ability to Do Work-Related Activities

(Mental)" form in which she indicated her opinion with regard to

plaintiff's ability to perform twenty-five mental activities.

(R. 776-80).  She indicated plaintiff has "good" ability (defined

as "Ability to function in this area is limited but

-17-

satisfactory") in ten activities, "fair" ability (defined as
"Ability to function in this area is seriously limited, but not
precluded") in eight areas, "poor or none" ability (defined as
"No useful ability to function in this area") in six areas. (R.
777-79).  With regard to abilities needed for <u>unskilled</u> work, the
therapist found plaintiff has no useful ability to:  Complete a
normal workday and workweek without interruptions from
psychologically based symptoms; Accept instructions and respond
appropriately to criticism from supervisors; Get along with co-
workers or peers without unduly distracting them or exhibiting
behavioral extremes; or Deal with normal work stress.  (R. 777-
78).  With regard to abilities needed for <u>semiskilled or skilled</u>
work, the therapist found plaintiff has no useful ability to deal
with stress of semiskilled and skilled work and is seriously
limited in the ability to:  Understand and remember detailed
instructions; Carry out detailed instructions; and Set realistic
goals or make plans independently.  (R. 778).  She also found
plaintiff has no useful ability to Interact appropriately with
the general public and is seriously limited in the ability to
Maintain socially appropriate behavior.  (R. 779).

    Portions of plaintiff's school records are contained in the
administrative record.  (657-62).  Included in the school records
are results of a "CTB Short Form Test of Academic Aptitude"
(SFTAA) dated Feb. 74, when plaintiff was thirteen and apparently

when he was in seventh grade.  (R. 657, 660).  Those results include IQ scores reported as "Lang." 70, "Nlang." 71, and "Total" 67.  (R. 657).  Plaintiff asserts that the SFTAA "has been found to yield results comparable to the Wechsler Intelligence Scale for Children (WISC)."  (Pl. Br., 25, n.1)(citing "GOOGLE SEARCH").  Plaintiff does not provide a URL (Uniform Resource Locator) address or sufficient other information to identify the source of his citation, and the court was unable to replicate his "Goggle search."  Therefore, the court will not assume that the SFTAA yields results comparable to the WISC.

Plaintiff's high school records reveal that plaintiff graduated in May, 1979, with a GPA of 1.94, and ranking # 85 out of 101 students.  (R. 662).  The record does not reveal that plaintiff took any special education classes.  Id.  Plaintiff received two "A"s, nine "B"s, twenty-seven "C"s, seventeen "D"s, and four "F"s.  (R. 662).  Both "A"s were received in the second semester of plaintiff's senior year and were received in "Voc. Ag." and "Bachelor Living."  Id.  The "B"s were received in "Voc. Ag." (1), "Bachelor Living" (1), "Am. Gov." (1), "P.E." (5), and "Shop" (1).  Id.  The "F"s were in "Biology," "Bus.," "Career Ed.-Tech.," and "Begin. Typing."  Id.

The record contains three Psychiatric Review Technique (PRT) forms dated Sept. 6, 2002 (R. 300-15), Mar. 24, 2003 (R. 359-75),

-19-

and Jan. 31, 2005.  (R. 736-51).  The PRT form completed in
Sept., 2002 found no severe impairments and, therefore, a Mental
Residual Functional Capacity Assessment was not necessary.  (R.
300).  There are two Mental RFC assessment forms dated Mar 24,
2003, (R. 376-80) and Jan. 31, 2005.  (R. 752-57).

### D.   Analysis

Considering the record as a whole, as the Commissioner and
this court are required to do, the court cannot find that
substantial evidence supports the ALJ's determination that the IQ
scores reflected in Dr. Barnett's report are not valid.  The ALJ
found the scores not valid because of Dr. Barnett's report,
plaintiff's high school record, and plaintiff's work history.
However, the ALJ did not properly consider the evidence regarding
these three areas, and did not consider other relevant and
probative evidence bearing on the validity of the IQ scores.

First, with regard to plaintiff's work history, the fact
that plaintiff attended truck driving school, has a commercial
driver's license, and was employed as a truck driver is not
necessarily inconsistent with being mildly mentally retarded.
The regulations specify that I.Q. scores ranging from "60 through
70" qualify an individual as mentally retarded.  The *Diagnostic
and Statistical Manual of Mental Disorders* (4th ed. 1994) ("DSM-
IV") distinguishes between four degrees of severity of mental
retardation:  mild, moderate, severe, and profound.  I.Q. levels

-20-

in the range of "50-55 to approx. 70" are labeled as "Mild Mental

Retardation."  DSM-IV describes mild mental retardation thus:

> Mild Mental Retardation is roughly equivalent to what
> used to be referred to as the educational category of
> "educable."  This group constitutes the largest segment
> (about 85%) of those with the disorder.  As a group,
> people with this level of Mental Retardation typically
> develop social and communication skills during the
> preschool years (ages 0-5), have minimal impairment in
> sensorimotor areas, and often are not distinguishable
> from children without Mental Retardation until a later
> age.  By their late teens *they can acquire academic
> skills up to approximately sixth-grade level.  During
> their adult years, they usually achieve social and
> vocational skills adequate for minimum self-support,*
> but may need supervision, guidance, and assistance,
> especially when under unusual social or economic
> stress.  With appropriate supports, *individuals with
> Mild Mental Retardation can usually live successfully
> in the community, either independently* or in supervised
> settings.

DSM-IV § 317.00 (emphasis added).  The Commissioner, in

promulgating Listing 12.05(C), expressly singled out individuals

with Mild Mental Retardation for special treatment in determining

entitlements to disability benefits.  Brown v. Sec'y of Health

and Human Servs., 948 F.2d 268, 270 (6th Cir. 1991).

The Commissioner's argument that continuous employment from

high school graduation in 1979 until 2003 supports a finding that

plaintiff is not mildly mentally retarded is contrary to the

premise underlying Listing 12.05(C).  As quoted above, DSM-IV and

Listing 12.05(C) assume many, if not most, mildly mentally

retarded individuals will be able to work.  However, they

recognize that some mildly mentally retarded individuals may be

unable to work where they have "a physical or other mental impairment imposing an additional and significant work-related limitation of function."  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.05(C).  This listing implies that such an individual will be able to work unless he has, or until he develops, a severe physical or additional mental impairment.  Therefore, the fact that plaintiff has a history of continuous employment in the past is irrelevant to whether he has subsequently become disabled due to the development of additional severe impairments.

The fact that an individual is able to work, and has attended schooling beyond high school has been held in several cases not to be inconsistent with mild mental retardation. Markle v. Barnhart, 324 F.3d 182 (3rd Cir. 2003)(obtained GED, employed painting, wallpapering and cutting grass, able to use judgment, function independently, work well with others, and maintain attention and concentration, do not necessarily undermine validity of IQ scores); Morales v. Apfel, 225 F.3d 310, 318 (3rd Cir. 2000)(work as a landscaper, laborer and packing line worker); Brown, 948 F.2d at 270 (could follow a road atlas and had worked as a truck driver); McKown v. Shalala, 1993 WL 335788 (10th Cir. 1993)(graduated from high school and had spent two semesters in college); Nieves v. Sec'y of Health and Human Servs., 775 F.2d 12, 14 (1st Cir. 1985)(worked as a seamstress). Therefore, the facts that plaintiff attended truck driving

school, had a commercial driver's license, and worked driving a
truck, are not inconsistent with being mildly mentally retarded,
and is not persuasive evidence that the IQ scores obtained are
not valid.

There are even greater problems in relying on plaintiff's
school records to support a finding the IQ scores are not valid.
As was cited above, case law indicates that graduating from high
school or obtaining a GED are not necessarily inconsistent with
mild mental retardation or indicative of invalid IQ scores.
Markle v. Barnhart, 324 F.3d 182; McKown v. Shalala, 1993 WL
335788.  Moreover, mildly mentally retarded individuals can
acquire academic skills up to approximately sixth grade level.
DSM-IV § 317.00.  Although plaintiff graduated from high school,
there is no direct evidence he was functioning at greater than a
sixth grade level.  Evaluation of his school records indicate
both that he did not have an "average" course of high school
instruction and that his achievement was generally poor.  Most
importantly, the school records indicate an IQ score of 67
obtained in the seventh grade.  That is at least some evidence
(contrary to the ALJ's finding) that the scores obtained in Dr.
Barnett's testing are valid.  However, the ALJ did not even
mention the IQ scores contained in the school records.  In making
his decision, an ALJ must consider all the evidence, and discuss
the evidence supporting his decision, the uncontroverted evidence

upon which he chooses not to rely, and significantly probative evidence he rejects.  Clifton v. Chater, 79 F.3d 1007, 1009-10 (10th Cir. 1996) (citing Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984)).  The ALJ's failure to discuss the IQ scores contained in the school records is reversible error.

Dr. Mintz's reports are relevant to a determination whether the IQ scores obtained by Dr. Barnett's testing are valid, but these reports were not discussed by the ALJ and there is no specific evidence the ALJ considered them.  In his first report, Dr. Mintz provided a "Diagnostic Impression" which specifically noted "Consider Functioning Within Mild Mentally Retarded Range." (R. 299).  The ALJ never discussed this notation.  While Dr. Mintz's second report does not suggest mild mental retardation, the reports considered together create an ambiguity which must be addressed and resolved by the ALJ.

The court's overarching concern is that no medical professional was aware of the IQ scores obtained when plaintiff was thirteen.  Dr. Mintz provided his first report in Jul., 2002 and his second report in Dec., 2004.  (R. 297-99, 733-35).  Dr. Barnett provided his report in Feb. 2003, and Ms. White-Blakesly provided her opinion in Jun. 2005.  (R. 340-45, 775-80).  The PRT forms and Mental RFC assessment forms were completed by the state agency consultants in Sept. 2002, Mar. 2003, and Jan. 2005.  The school records were signed by the Registrar on Aug. 3, 2005 and

subsequently delivered to the Agency by plaintiff's attorney.
(R. 656, 662).  This time line makes abundantly clear that none
of the medical professionals were aware of plaintiff's record of
an IQ score of 67 at age thirteen.  As discussed above, the court
will not assume that scores from an SFTAA are comparable to those
from a WISC.  However, mental health professionals would likely
know that information or be able to find it.  The court will not
speculate how the opinions of the mental health professionals may
have changed had they been aware of plaintiff's SFTAA scores at
age thirteen.  On remand, the Commissioner should provide the
school records to Dr. Barnett at least, and should seek
clarification of his opinions based upon a complete record.

Another fact which concerns the court is that, apparently,
plaintiff spent two years undergoing treatment at Osowatomie
State Hospital around 1985 (R. 297, 341), yet the ALJ did not
seek to obtain records regarding that treatment.  While that
treatment was clearly before the alleged period of disability at
issue, consideration of whether plaintiff's condition meets or
equals Listing 12.05(C) involves a determination whether
plaintiff has "deficits in adaptive functioning initially
manifested during the developmental period."  20 C.F.R., Pt. 404,
Subpt. P, App. § 12.05.  The court would note that records
regarding plaintiff's mental condition in about 1985 when
plaintiff was age twenty-four would have at least some relevance

to whether plaintiff has, or had, deficits in adaptive functioning and whether those deficits, if any, initially manifested before age twenty-two.  On remand, the Commissioner should seek to obtain those records and should provide copies of them to Dr. Barnett to aid in his evaluation of the evidence and the results of his testing of plaintiff.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision be REVERSED and that JUDGMENT be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) REMANDING this case to the Commissioner for further proceedings in accordance with this opinion.

Copies of this recommendation and report shall be delivered to counsel of record for the parties.  Pursuant to 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b), and D. Kan. Rule 72.1.4, the parties may serve and file written objections to this recommendation within ten days after being served with a copy. Failure to timely file objections with the court will be deemed a waiver of appellate review.  Hill v. SmithKline Beecham Corp., 393 F.3d 1111, 1114 (10th Cir. 2004).

Dated this 3rd day of July 2007, at Wichita, Kansas.


s/John Thomas Reid
**JOHN THOMAS REID**
**United States Magistrate Judge**